Filed 5/16/13  P. v. Custodio CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DAVID RICHARD CUSTODIO,<br><br>    Defendant and Appellant. | A130784<br><br>(Contra Costa County<br>Super. Ct. No. 05-100354-0;<br>04-161171-4) |

David Richard Custodio appeals from convictions of resisting a peace officer causing serious bodily injury and resisting an executive officer. He contends his convictions must be reversed due to the trial court's denial of his motion to run a rap sheet for the police officer complaining witness, the prosecutor's failure to provide timely discovery and misstatement of facts to the court, and the trial court's failure to give a unanimity instruction to the jury. He additionally contends he was awarded an insufficient number of presentence custody credits. We remand for a hearing on calculation of presentence conduct credits and otherwise affirm the judgment.

**STATEMENT OF THE CASE**

Appellant was charged with two felony counts, causing serious bodily injury while resisting a peace officer (Pen. Code, § 148.10)[1] and resisting an executive officer (§ 69).

_____

[1] All further statutory references will be to the Penal Code unless otherwise specified.

1

It was further alleged that appellant violated probation in committing the charged offenses (§ 1203.3); that he had previously served a prior prison term (§ 667.5, subd. (b)); and that he was ineligible for probation due to prior convictions (§ 1203, subd. (e)(4)). On April 19, 2010, appellant pled not guilty and denied the enhancement allegations.

Jury trial began on July 19, and on July 27, appellant was found guilty as charged. On August 23, the court found the enhancement allegations true and ordered appellant evaluated under section 1203.3. On December 10, appellant was sentenced to three years in prison. He filed a timely notice of appeal on the December 20, 2010.

## STATEMENT OF FACTS

On the evening of March 2, 2010, bus operator Terry Damian allowed appellant, who was homeless, to ride his bus without paying. Appellant was on the bus for between five and 15 minutes. Damian did not remember appellant by appearance, explaining that he saw 300 people a day, did not remember faces and often let people ride for free, but when shown a video recording from the bus surveillance camera, he remembered the incident from appellant's laugh.

Damian testified that when appellant first got on, he picked up some trash from under the seats of the bus. Appellant stared at the other passengers and Damian felt appellant staring at him, making him uncomfortable. Appellant crossed the yellow line passengers were required to stand behind when the bus was moving. Damian warned him to move back, because he was not legally permitted to continue moving with a passenger in front of that line. When appellant crossed the line again and continued to stand there, Damian stopped the bus. He testified that appellant was "getting a little closer than my comfort zone" and he was concerned for his passengers' safety as well as for his job, because he might "snap" and "get mad." Damian testified, "you sense things a little bit. You can sense if someone . . . might give you a bad time." Appellant was acting "a little bit odd."

Damian got off the bus; he explained that, in trying to calm the situation with a rowdy passenger, he would open the door and walk outside, and sometimes the passenger

2

would follow.  Appellant got off, asked Damian for a cigarette and tried to grab the one Damian was smoking, but immediately let go.  Appellant moved away from him and Damian got back on the bus, shut the door and called dispatch.  He explained that the procedure when there was a rowdy passenger the driver did not want on the bus was to call and have a supervisor come out to deal with the person.  He was about to drive away when appellant walked in front of the bus and stood there.  Damian told the dispatcher, who called the police and told Damian not to move the bus.  Appellant banged his head on the driver's side of the window and said, "I'm going to whoop your ass," then moved to the passenger door and tried to force the doors open.  The police arrived and appellant disappeared from view except for his legs on the ground by the door; Damian remembered telling the dispatcher, "they got him on the ground, he was giving them trouble."  He heard appellant yelling two or three times, "stop hurting me."  Damian told the police what had happened.

Damian did not see appellant asking any of the bus riders for money or cigarettes, and he did not demand money from Damian or hit him.  Damian denied telling the police that appellant had "cussed [him] out" or bothered riders for money or cigarettes.  Damian acknowledged that he had been arrested for resisting arrest in 2004 but stated that he had not in fact resisted and no charges were filed against him.

Police officer Marty Hynes testified that he was dispatched to respond to a call concerning a person causing some type of disturbance on a Tri Delta Transit bus.  Dispatch reported that the bus driver said a male subject was "either acting crazy or like he was on drugs, bothering the driver and passengers, not following the rules."  He arrived to find appellant alternately pounding on the bus doors and trying to pull them open, and screaming.  As he approached from the rear of the bus, Hynes shouted for appellant to step away but got no response.  As he got within arm's length of appellant, he ordered appellant to get away from the bus and appellant appeared to notice him for the first time.  Appellant turned toward him and very quickly moved toward him, with his arms up and fists still clenched from banging on the bus door.

3

Interpreting appellant's movement as a "likely assault" on him, Hynes moved to his right to sidestep a potential charge. As appellant came toward him, Hynes decided to take him "down to the ground." He grabbed appellant around his upper body and used a leg sweep, pushing appellant over his right leg and down to the ground, then falling on top of appellant. Appellant fell front down on the sidewalk and Hynes was straddling him with his right knee across appellant's back. Appellant began to "struggle in earnest," trying to throw punches at Hynes, rolling from side to side and "bucking up and down." Hynes told appellant he was under arrest and tried to keep him on his stomach in order to handcuff him. Appellant repeatedly said, "just kill me, just kill me."

Appellant managed to get onto his back, with Hynes now straddling his upper chest area, and continued to try to stand up or wiggle free. Hynes used his right knee to pin appellant's left arm across his chest, while pressing down on that arm with his right hand and trying to get control of appellant's right hand. Realizing he was not going to be able to handcuff appellant by himself, Hynes was trying to hold appellant until Officer Magana, who had been dispatched at the same time, arrived.

Appellant looked at Hynes, said, "your shoelaces are untied," and looked at Hynes's left leg. Hynes wondered why appellant would say such an odd thing and thought appellant wanted him to look that way because he was going to try to punch Hynes with his right hand. As he had this thought, Hynes felt appellant pull at the pistol holster on his ankle, where he kept his backup gun. The gun did not have a safety and Hynes kept it with a round chambered, ready to fire. Hynes realized that appellant had seen the gun because the pant leg that usually concealed it had come halfway up his leg. He moved his leg out of appellant's reach, breaking appellant's grip, then struck appellant's face and head three or four times. Appellant seemed momentarily taken aback and Hynes was able to roll him back onto his stomach and control his left arm, although he was still not able to handcuff or fully control him. At this point, Officer Magana arrived and the two officers handcuffed appellant. Appellant refused to walk and continued to scream and try to throw himself out of the officers' grip as they essentially

4

carried him the 40 feet to a patrol car. There, appellant continued to shout and tell the officers to kill him, as well as bashing his head against the back seats and partition in the vehicle. Hynes did not recall appellant ever saying, "stop hurting me."

As they were escorting appellant to the patrol car, Hynes noticed that his right hand was painful and swollen, especially his pinky finger, which was swollen to twice its normal size. He believed he sustained this injury while punching appellant. After talking to Damian and to the passengers on the bus, Hynes went to the hospital, where X-rays were taken and he was placed in a cast. He was in the cast for six weeks, during which time he was assigned to desk duty.

Hynes talked with Damian, who said that appellant had been walking around the bus bothering passengers and when he told him to sit down and follow the rules, appellant approached him and began "cussing him out" and asking for money. Hynes testified that Damian told him he thought appellant was mentally ill or high or both, and he needed to get him off the bus. He parked and appellant grabbed him, causing Damian to run off the bus; appellant followed, Damian ran back on, closed and locked the doors, and waited for the police.

Officer Joseph Magana testified that when he arrived at the scene, Hynes and appellant were fighting or struggling on the ground, Hynes controlling one of appellant's arms and appellant swinging his legs and attempting to roll around. Appellant was on his stomach and Magana put his knee on appellant's back to pin him down, then freed appellant's arm from under his chest, and the two officers handcuffed appellant. As they took appellant to the patrol car, he continued to scream and struggle; once in the car, he kicked the seats and windows and slammed his head into the partition for five to 10 minutes until an ambulance arrived.

A community service officer for the Antioch Police Department who was supposed to process appellant after an arrest in 2009 testified that appellant resisted to the point where the officer was unable to fingerprint or photograph him and appellant had to be restrained in a wrap.

5

The bus surveillance video does not show any part of the interaction between appellant and the police. It does show appellant's initial conversation with Damian, as he got on the bus, and appellant bending over to pick things up off the floor of the bus, and appellant's laugh can be heard throughout the recording. Appellant can be seen standing near the driver at times and at times sitting down. After appellant got off the bus and Damian got back on, the dispatcher can be heard saying the police are on the way, and the sound of knocking on the bus door can be heard. Damian can be heard saying something to the effect of "they've got him on the ground, he's giving them trouble" and a minute or so later a voice can be heard yelling "stop hurting me." Later, Damian can be seen outside the open door of the bus discussing the incident with the police.

Defense

Appellant testified that he was 53 years old, had been homeless for the past 12 years, and had been smoking crack cocaine off and on for 12 years. He acknowledged having been convicted of felony commercial burglary in 2009 and when asked about 2002 convictions for receiving stolen property and grand theft stated that he did not remember that far because he had had memory problems since suffering a grand mal seizure in 2005, when he was in custody for petty theft and was not permitted to take his seizure medication.

Appellant testified that on March 2, when the bus pulled up, he had just smoked some very high potency crack, much stronger than he realized it was going to be. He and the driver smiled at each other, he said he was homeless and needed a ride and "everybody knows what I'm doing anyway, don't they."[2] He laughed and the driver let him get on the bus without paying. Feeling "spooked" from the drug, appellant sat down right away; although he sometimes would pick up garbage on the bus and throw it away,

---

[2] Asked what he meant by this, appellant explained, "when the drug is that potent, it gives you an awakening experience. . . . I felt one with all creation. It was like god speaking to me in one ear, as well, like from social security, from my wife, from my sister. Voices telling me it's enough already. We're waking you up."

he did not do that on this occasion. He turned to some ladies on the bus and, "mocking [him]self," asked, "can a homeless man get a little help with a few dollars." They laughed and smiled at him. He considered taking another hit from the crack pipe that was still in his hand, realized this was "insane" and got off the bus "right away."

Appellant walked in front of the bus and threw his hands in the air; when the bus did not leave, he figured the police had been contacted. He walked around the front of the bus a second time and "worked the windshield wipers one time being an ass." He testified that he was having an "awakening experience" that he found "very spiritual." He figured he was going to jail and would be off the streets for a little while, and waited for the police because he "wasn't in any condition to walk away from that type of awakening experience" and agreed with the messages he was getting in his head telling him it was time to stop smoking "this poison" and "god had [him] in the palm of his hand." But he "hit" the cocaine again before the police arrived. Appellant testified, "I threw the pipe down, smashed it, I went to my knees, prayed a little bit. I turned around, and there were people on [the] bus . . . praying for me."

Appellant saw the police officer approaching, smiling. The officer acknowledged a couple of people who were standing next to appellant, then turned to appellant and they made eye contact. In his mind, appellant heard the officer's thoughts as "don't trip, don't worry, we're here to help you, we love you." Appellant said, "I love you, too," and went to give him a hug. The officer spun appellant around and said, "no, no, I need you down on your face" and "assisted me in laying down." The officer was "gentle" and "very courteous about helping me to my face on my stomach."

Appellant testified that he did not raise his fist or yell at the officer. Knowing he was going to jail for being under the influence and disturbing the peace, appellant was "being an ass" and teased the officer, pointing at the officer's shoe and saying, "your shoe is untied." A few seconds later, all of a sudden, the officer started hitting appellant's face. Appellant screamed, "[w]hy are you fucking hitting on me," because he was complying with everything the officer asked him to do. Appellant thought that when

7

he started to scream, the officer missed with one of his punches, hit the ground and broke his knuckle. He testified that he never saw the officer's ankle holster and thought the officer said he reached for the holster because the officer needed to justify hitting him. Appellant said he panicked when the officer started hitting him and might have said something like "you might as well go ahead and kill me" because he felt betrayed. He "might have struggled a little bit" as he was being cuffed because he was angry about being hit. In the patrol car, he yelled at the officers and called them names, trying to make sense of what was happening. He believed he had been "set up" by the county because the county realized he still had grounds to sue for its medical negligence in 2005, and was angry because he had used his disability check to buy crack.

Appellant denied resisting arrest on March 2 and stated that although he had been "in trouble with the law many times," he had never resisted or "had a fist fight with a police officer." He subsequently acknowledged on cross-examination that he had been convicted of resisting arrest in 2008 or 2009, and described an incident in which he resisted to the extent that police officers put him in a "body wrap." Appellant testified that he perceived things more clearly when he was on crack and that he did not hallucinate. He testified that the surveillance video shown in court was not from the day of the incident, that the incident when he was arrested took place during the day and involved a different driver, and that he was only on the bus for a minute or minute and a half. He said he thought the tape had been "doctored" and spliced together, because it showed parts of what happened but not other parts.[3] When the officers testified that the

---

[3] Appellant testified, "Again, when I got on that bus, I asked people for money. That's not in the beginning of this tape; is it? [¶] Another thing that's not in the tape is me screaming outside of the door. If you would have gone a little further where I'm supposed to be outside of the door yelling at the driver to let me back in, none of that is there. And none of that is there that says when the officer ran up and took me to the ground, none of his shouts, you're under arrest. None—you don't hear the officer—you don't hear any of that in this tape because it didn't happen. . . . [Y]ou could hear the knock. Couldn't you hear the knocking? . . . Could you hear the man back there saying, oh, don't hurt me, don't hurt me? But you can't hear you're under arrest, get away from

March 2 incident took place at 9:00 p.m., they were lying; the incident they described was "a different incident all together [*sic*]." Appellant thought Officer Hynes made up a different incident because he "needed to justify breaking his knuckle" or for "insurance purposes."

## DISCUSSION

### I.

Appellant contends his constitutional rights to due process and equal protection were violated by the trial court's denial of his timely motion for disclosure of Officer Hynes's criminal history ("rap sheet"). As will be seen, the prosecutor disclosed that Officer Hynes had been convicted in about 1995 of an offense referred to as a "wet reckless," a reduced version of driving under the influence (see *People v. Claire* (1991) 229 Cal.App.3d 647, 650). After the jury had begun deliberations, defense counsel discovered that the conviction was actually for driving under the influence, and occurred in 1999. Appellant now argues that the trial court's failure to require the prosecutor to run a rap sheet for the officer, as it would have been required to do for civilian witnesses, combined with its failure to grant the remedies appellant requested when the correct information came to light, destroyed the structural integrity of his trial.

The background is lengthy. On June 17, 2010, appellant filed a motion to compel discovery under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 535, seeking evidence of complaints or investigations concerning allegations of excessive force or dishonesty involving officers Hynes and Magana. Additionally citing *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) and *Garden Grove Police Department v. Superior Court* (2001) 89 Cal.App.4th 430, appellant sought any records tending to show the officers had been arrested for or convicted of crimes of moral turpitude and an order requiring the police department to disclose the officers' birthdates, and the prosecution to use those dates to run criminal records checks on the officers and disclose its findings in the presence of

the door. You can't hear any of that other stuff because it didn't happen, pal. This is a separate incident."

9

defense counsel. At a hearing on July 13, 2010, defense counsel explained that he was seeking disclosure of information concerning crimes of moral turpitude because the officers' credibility was at issue and, while the prosecutor's office was obligated to run rap sheets for all trial witnesses, the office practice was to refuse to run them for police officers. The court granted the *Pitchess* request for in camera review of the officers' files and found no information required to be disclosed to the defense, but ordered disclosure of the officers' birth dates.

Among its motions in limine, filed on July 19, 2010, the defense asked the court to order the prosecution to run rap sheets on all prosecution witnesses, including police officers, and for that purpose provided the officers' birth dates it had obtained through *Pitchess* discovery. The People objected to running rap sheets on the officers[4] while the defense argued that officers' credibility was at issue and they should not be treated differently than any other witness. The court granted the defense motion.

The next day, July 20, the prosecutor reported that his supervisor did not want raps run on the officers but allowed him to ask them about their criminal histories, as a result of which he had disclosed to defense counsel that each officer had a single conviction, a 1995 "wet reckless" (a reduced version of driving under the influence (see *People v. Claire, supra,* 229 Cal.App.3d 647, 650) for Officer Hynes and a reckless driving for Officer Magana. Although the court had ordered the prosecutor to run the rap sheets, the

---

[4] The prosecutor stated, "I understand the obligation for civilian witnesses and even understand the obligation for someone who works at the crime lab, like criminalists. I don't see a basis to run raps on my officers in this case. I do know a *Pitchess* was ran [*sic*]. There was nothing of any relevance. There is nothing in the closet, as it were, with those officers. And I don't see that there needs to be any obligation to run a rap on my sworn peace officers in this case." Defense counsel responded that section 1054 required the prosecution to disclose prior convictions or acts of moral turpitude for any witnesses, the officers' credibility was at issue and there was no reason to treat police officers differently than any other witnesses. Defense counsel pointed out that *Pitchess* discovery only pertained to material in the officers' personnel files, which would not contain a rap sheet, and that police officers should not be given an advantage over other witnesses concerning the jury's evaluation of their credibility.

10

prosecutor stated that he thought the court had given him the option of obtaining the information a different way. Defense counsel pointed out the irony of simply asking a witness about his criminal history when the relevance of that information would be its bearing on the witness's credibility. Accepting the logic of this point, the court nevertheless decided to reverse its prior order and follow the "usual rule" of the courthouse to not order the running of rap sheets on police officers.[5] Defense counsel conceded that the disclosed offenses did not constitute crimes of moral turpitude.

The defense then asked the court to order disclosure of the police reports from the officers' offenses so they could be reviewed for possible impeachment material; against the prosecution's objection that the offenses did not reflect moral turpitude, defense counsel argued that because of plea bargaining or other factors, the ultimate disposition might not reflect the actual conduct involved. The court denied the defense request, as well as its subsequent request for the court to review the police reports in camera to see if the circumstances of the offenses revealed any tendency toward untruthfulness.

After the case was submitted to the jury, on July 27, defense counsel told the court he had learned from review of a docket that Officer Hynes's disclosure to the prosecutor that he had been convicted of a "wet reckless" in 1995 was untruthful in that the conviction was actually for driving under the influence of drugs and alcohol (DUI) and occurred in 1999. The prosecutor downplayed the discrepancy, saying he had only represented that the conviction occurred "about" 1995. Conceding that a misdemeanor DUI conviction would not constitute a crime of moral turpitude, defense counsel argued that a witness whose credibility was essential to the prosecution's case had lied to the prosecutor about his record. The prosecutor objected to the characterization of Hynes's

---

[5] Citing *Garden Grove Police Department v. Superior Court, supra,* 89 Cal.App.4th 430, the court questioned whether, as a matter of separation of powers, it had to be left to the prosecutor to determine how to obtain moral turpitude information required to be disclosed under *Brady.*

"lying," saying the officer was "candid about something that took placed in the 1990s." The court ordered the prosecutor to provide it with Hynes's rap sheet.

After running the officer's rap sheet, the prosecutor confirmed that Hynes suffered a DUI conviction in 1999 and again urged that there had been no deception. More likely, the prosecutor suggested, Hynes misunderstood the precise nature of his conviction, perhaps because it occurred six years before Hynes became a police officer and the case involved a dismissed count. The prosecutor explained that Hynes had not been exactly sure as to the year, and had said that according to his memory a DUI had been reduced to a "wet reckless."

Defense counsel asked the court to instruct the jury that Hynes "was untruthful about his criminal record in a conversation with the District Attorney last week." Urging that the jury should determine whether Hynes was intentionally dishonest, defense counsel argued that Hynes's credibility was critical because the defense closing argument was based on "the idea that [appellant] never reached for the holster, that Officer Hynes was not credible at that point, and instead Officer Hynes had punched [appellant] for his smart-aleck comment about the shoelace being untied." Defense counsel also raised a question, based on what he had seen on the docket, as to whether the conviction was a first time DUI, because the sentence was "ten days SWAP, he was ordered to do PCDDP, and take Antabuse," the latter two terms were "very unusual for a first-time DUI" and Hynes's blood alcohol content was 0.17.[6] The prosecutor argued there was an insufficient basis for concluding Hynes had been untruthful rather than only mistaken. Defense counsel suggested that the jury be told the facts without characterization as untruthful or truthful—"something along the lines of last week in response to a question from the District Attorney, Officer Hynes disclosed that he had a wet reckless conviction

---

[6] The original certified copy of the rap sheet apparently went missing at some point before December 20, 2010. A duplicate copy included in the record reflects the 1999 misdemeanor conviction with sentence described as "3 years probation, 10 days jail, fine, work program."

from about 1995, and the court had subsequently learned the conviction is actually a standard misdemeanor DUI from 1999."

At this point, the court addressed the prosecutor: "[O]ne of the things that concerns me about this innocent mistake of Mr. Hynes is that everybody knows that a wet reckless doesn't result in a ten-day jail sentence. It's usually a no-jail sentence, just a fine. [¶] You're the person that talked with him, and you said something different in your description of it just a few minutes ago. You said that he had a DUI, he thought that it was reduced to a wet reckless, and before I don't remember you saying anything about his having a DUI, just it was a wet reckless."

The prosecutor clarified that he initially reported to the court the conviction Hynes said he actually suffered, and was now recounting the detail of the conversation because the court was trying to determine whether there had been any deception. Defense counsel accused the prosecutor of having intentionally misrepresented events repeatedly, and stated that he believed Hynes had in fact told the prosecutor his conviction was a wet reckless in 1995.[7] Responding to this argument, the court suggested it might not be accurate to attribute the misstatement about Hynes's conviction to the officer, and defense counsel stated that if the prosecutor had been untruthful, the jury should know.

_____

[7] Defense counsel stated, "I hate to say this, but I think [the prosecutor] has had a pattern in this trial of shading what actually happened once he is called on it, and there are two examples. The first is whether Your Honor ordered him to run a rap last week, which you clearly did, or told him that he could either run a rap or merely ask the officers. It was clear in the record that the court ordered the rap and suggested as an additional practice asking the officers. But [the prosecutor] has insisted on trying to muddy those waters. [¶] The second issue is he said when we were here earlier this morning that Officer Hynes had made some comment about 1995, give or take two or three years. Not true. That was never disclosed to me. That was never discussed on the record. Those were details added later to try to clear up the fact that it was really 1999. [¶] I hate to say it, but I don't find [the prosecutor] credible because I think he's had a pattern of, frankly, intentionally misrepresenting what has happened on the record in this trial, and I'm frustrated with it. And I think Officer Hynes told him it was a wet reckless in about 1995. That's the reality. We now know that wasn't true. The jury needs to know, that and that's why I'm asking for this equitable remedy."

When the court said it had no way to resolve what happened in the conversation between the prosecutor and the officer, defense counsel suggested an Evidence Code section 402 hearing, saying the prosecution should not be able to "hide behind ambiguities that were manufactured after the fact."

As the prosecutor continued to argue that there had been no deception, the court asked him, "[a]s an officer of the court," whether Hynes's had said he had a "wet reckless" or that "it was either a DUI or a wet reckless and he couldn't recall?" The prosecutor said Hynes had initially said "DUI" but ultimately the prosecutor was convinced that Hynes believed he was convicted of a "wet reckless," perhaps "reduced or something." When defense counsel protested that the sentence Hynes received could not have been due to a wet reckless and there was no mechanism for reducing regular DUIs to "wet recklesses," the prosecutor argued that prosecutors sometimes would use a "heavy wet," involving jail time, to resolve a case where the defendant preferred to do time in order to avoid collateral consequences stemming from a DUI conviction.

The court accepted the prosecutor's representation of what Hynes told him "even though it's at odds with his record," and stated its intention to inform the jury of what Hynes had said and what the new information revealed. The prosecutor urged the court to bring the officer in to clear up the situation, because he did not want the jury given the impression there had been "underhandedness" when the prosecutor did not sense any in his conversation with the officer. The court responded, "Your argument isn't ringing true at all. He's been an officer for four years. This is what he's been doing for four years. He knows the difference between a wet reckless and straight DUI, and it's his only criminal conviction. I'm sure he knows—knew what he was doing. [¶] I'm giving you a break. I think, in part, by not categorizing it, despite my suspicions, because I can't say for sure, but I think we all know that you just don't confuse that. And it's been—my experience has been far different from yours that you get a wet reckless when you have a 0.15 or 0.17, or whatever it was . . . [a]nd you get ten days in jail."

14

The jury returned to the courtroom and the court instructed, "[T]here's . . . been some additional evidence that's been provided to the court. [¶] Last week Officer Hynes had a conversation with the District Attorney regarding his criminal record. Officer Hynes represented that he had a wet reckless, alcohol-related reckless driving, which is a lesser offense of driving under the influence of alcohol, in 1995. But it's been ascertained that he actually had a driving under the influence of alcohol in 1999. So it's something that you should be aware of, and I'm not going to categorize it as being truthful or untruthful, but that was what was told to the District Attorney, and then the facts were different from what he was told . . .."

When the prosecutor subsequently asked the court to clarify that Officer Hynes did not say "in 1995" but rather "about 1995," and asked for an opportunity to present argument to the jury about the issue, the court noted the objection, said it believed its remedy was adequate, and told the prosecutor, "when someone gets ten days for a DUI, . . . I have really serious doubts as to whether or not they are mistaken when they say it was a wet reckless. But I don't have Officer Hynes here to explain, and so we'll just leave it as it is."

Due process requires the prosecution to disclose evidence, including impeachment evidence, that is favorable to the defense and material. (*Brady, supra,* 373 U.S. 83, 87; *Kyles v. Whitley* (1995) 514 U.S. 419, 432–433; *In re Miranda* (2008) 43 Cal.4th 541, 575.) " 'Evidence is "favorable" if it . . . helps the defendant or hurts the prosecution, as by impeaching one of [the prosecution's] witnesses.' ([*In re*] *Sassounian* [(1995) 9 Cal.4th 535,] 544.) 'Evidence is "material" "only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different." ' (*Ibid.*; accord, *Kyles v. Whitley* [, *supra,*] 514 U.S. 419, 433–434.) Such a probability exists when the undisclosed evidence reasonably could be taken to put the whole case in such a different light as to undermine confidence in the verdict. (*Kyles*, [*supra,* 514 U.S.] at p. 434; *In re Brown* (1998) 17 Cal.4th 873, 886–887.)" (*In re Miranda, supra,* 43 Cal.4th at p. 575.)

15

Appellant contends that the trial court failed to require the prosecutor to comply with his *Brady* obligations by not insisting that he run Hynes's rap sheet when the prosecutor instead offered information about a misdemeanor conviction obtained from a conversation with Hynes. Relying upon the principle that the prosecutor is responsible for gauging the likely effect of favorable evidence and making disclosure when "the point of 'reasonable probability' is reached" (*Kyles v. Whitley, supra,* 514 U.S. at pp. 421, 437), respondent argues that it was for the prosecutor to determine the means by which he ascertained whether there was information to be disclosed to the defense.

Appellant was entitled to discovery of any misdemeanor conviction involving moral turpitude that Hynes had suffered. (*People v. Santos* (1994) 30 Cal.App.4th 169, 178–179.) In arguing that the prosecutor should have been required to run the rap sheet rather than simply ask Hynes about his criminal history, appellant relies upon *People v. Little* (1997) 59 Cal.App.4th 426. *Little* held that because the prosecutor has access to rap sheets that is not shared by the defense, the prosecutor is required by statute (§ 1054.1) and under *Brady* to disclose " 'the existence of a felony conviction of any material witness whose credibility is likely to be critical to the outcome of the trial.' " (59 Cal.App.4th at pp. 433–434.)[8] Although *Little* involved an undisclosed felony conviction, disclosure of which is specifically required by section 1054.1, subdivision (d), where the credibility of a material witness is likely to be critical to the outcome of the trial, its logic applies equally to a conviction for a misdemeanor involving moral turpitude, as disclosure of such a conviction would be required under *Brady*.

---

[8] The *Little* court held that the existence of a felony conviction was in the possession of the prosecution for purposes of section 1054.1 because it was reasonably accessible to the prosecution, in light of the Department of Justice's policy of releasing rap sheets only to prosecutors, and that under *Brady*, the prosecution must disclose "evidence that is ' "actually or constructively in its possession or accessible to it." ' " (*People v. Little, supra,* 59 Cal.App.4th at pp. 431–433.)

16

(*People v. Santos, supra,* 30 Cal.App.4th at pp. 178–179.)[9] Respondent, however, argues that *Little* does not impose any obligation on the prosecution to actually utilize its access to rap sheets, but only holds that because of that access the prosecution can not claim an inability to provide the defense with information about a witness's conviction.

Where a prosecutor's failure to run a rap sheet results in nondisclosure or inaccurate disclosure of information that is required to be provided to the defense, it is difficult to accept respondent's position. Nevertheless, we need not resolve this point because, in the particular circumstances presented here, there was neither a *Brady* violation nor prejudice resulting from any error by the trial court.

Appellant's claim is grounded on the trial court's refusal to order the prosecution to run Hynes's rap sheet. Had it so ordered, the defense would have been informed that Hynes had a 1999 misdemeanor DUI conviction rather than, as it was in fact told, a misdemeanor for a reduced form of that offense. In and of itself, this information would not have made a difference at trial: Appellant concedes that a single DUI conviction has never been found to be an offense involving moral turpitude, and " 'the admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude.' " (*People v. Clark* (2011) 52 Cal.4th 856, 931, quoting *People v. Wheeler* (1992) 4 Cal.4th 284, 296.)

Noting that a felony conviction for DUI with three or more separate DUI convictions within seven years has been found to involve moral turpitude (*People v. Forster* (1994) 29 Cal.App.4th 1746, 1756 (*Forster*)), and that the sentence for Hyne's DUI conviction raised questions about whether it was a simple first-time offense,

_____

[9] Appellant suggests evidence of a witness's conduct amounting to a misdemeanor involving moral turpitude is subject to discovery under section 1054.1, subdivision (e), requiring the prosecutor to disclose "[a]ny exculpatory evidence." *People v. Santos, supra,* 30 Cal.App.4th at p. 178, expressly rejected this argument, holding that evidence of a misdemeanor conviction "does not tend to demonstrate the defendant is free from guilt and it does not demonstrate the defendant was in fact innocent of the charged crime."

17

appellant argues that timely disclosure of Hynes's conviction might have allowed him to uncover evidence of circumstances of the offense that would demonstrate moral turpitude.

But despite the trial court's and defense counsel's observations that the sentence for Hynes's conviction seemed disproportionate to a first time DUI, there is little likelihood such a search would have yielded evidence of moral turpitude that could have made a difference at trial. *Forster* found that a felony DUI conviction based on multiple prior DUI convictions involved moral turpitude because it was "a recidivist type crime involving an extremely dangerous activity," the prior convictions made the defendant "presumptively aware" of the risks involved, and "[c]ontinuing such activity despite the knowledge of such risks is indicative of a 'conscious indifference or "I don't care attitude" concerning the ultimate consequences' of the activity ([citation]) from which one can certainly infer a ' "depravity in the private and social duties which a man owes to his fellowmen, or to society in general, contrary to the accepted and customary rule of right and duty between man and man." ' ([Citations].)" (29 Cal.App.4th at p. 1757.) Here there is little likelihood Hynes had suffered additional DUI convictions, as they would have been reflected on his rap sheet. Appellant offers no explanation what circumstances might have been involved in an offense resulting in a misdemeanor DUI conviction that would have reflected moral turpitude and therefore been relevant on the issue of Hynes's credibility.

Aside from the court's failure to order the prosecutor to run the rap sheet, appellant frames the prosecutor's decision to rely upon Hynes's representation rather than obtain official documentation of the officer's criminal record as a violation of *Brady*. The prosecutor's refusal to run the rap sheet, resulting in inaccurate information being provided to the defense and the court, is indeed disturbing. Under *Brady*, the prosecution "must disclose evidence that is ' "actually or constructively in its possession or accessible to it" ' " (*People v. Little, supra,* 59 Cal.App.4th at p. 433, quoting *United States v. Auten* (5th Cir. 1980) 632 F.2d 478, 481) and must investigate sufficiently that it not

18

" ' "keep itself in ignorance." ' " (*People v. Little, supra,* 59 Cal.App.4th at p. 434, quoting *United States v. Young* (7th Cir. 1994) 20 F.3d 758, 764.) Rejecting the argument that the defense failed to show good cause for discovery of a prosecution witness's felony conviction record because it did not explain why the defense could not obtain the information from the witness, *Hill v. Superior Court of Los Angeles County* (1974) 10 Cal.3d 812, 819, observed, "It cannot be assumed that a person will give accurate and complete information regarding any prior felony convictions he may have." As this case demonstrates, the same is true of a person's record of misdemeanor convictions.

Nevertheless a *Brady* violation occurs only if the undisclosed evidence was material. (*In re Miranda, supra,* 43 Cal.4th at p. 575.) Here, to be material, the evidence that Hynes had a prior misdemeanor DUI conviction from 1999 rather than a "wet reckless" from 1995 would have been material only if its earlier disclosure would have enabled the defense to cast sufficient doubt on Hynes's credibility to undermine the verdict.

It would not. The defense was informed that Hynes had a misdemeanor conviction for a driving offense related to alcohol. The difference in seriousness of the offense did not bear directly on Hynes's veracity or otherwise make it a moral turpitude offense that would be admissible for impeachment. Even if we were to assume the defense might have been able to find something in the circumstances of the DUI offense reflecting moral turpitude, it is all but impossible to believe it would have been of sufficient significance to undermine the jury's verdict.

Fundamentally, the jury's task was to determine whether to believe appellant's or Hynes's descriptions of the incident. Even assuming some degree of impeachment based on Hynes's DUI conviction, appellant's credibility was far more questionable than Hynes's. By his own description, appellant was seriously under the influence of crack cocaine during the incident, and his description of the events—including his "awakening experience," the voices he was hearing in his head, the people on the bus praying for him

19

and Hynes's courteously and gently helping him to the ground when appellant went to hug the officer—cast significant doubt on his ability to accurately perceive and recall what happened. While no other witnesses described the initial encounter between appellant and Hynes, several aspects of appellant's overall description of the incident were at odds with both the surveillance video and Damian's testimony. Appellant testified that the incident occurred during the daytime, that he did not pick up trash when he got on but rather sat down "right away," asked some passengers for money and got off again after a minute or minute and a half. However, the video depicted a nighttime incident and showed appellant picking up things from the floor of the bus and remaining on the bus for a much lengthier period of time. Appellant's explanation of these and other discrepancies, and of the fact that the video did not document Hynes yelling at appellant as he approached the bus, was that the video depicted an entirely different incident, on a different date, with a different bus driver, and had been "doctored" to show parts of the March 2 incident and not other parts. Damian, however, recognized the incident from the video. Further undermining appellant's credibility, he was impeached on a subject directly related to the charged offense when he was shown to have been convicted previously of resisting arrest after denying having ever resisted arrest.

Indeed, what actually transpired at trial as a result of the inaccurate information supplied by the prosecution probably cast more doubt on Hynes's credibility than anything defense counsel might have been able to find in the incident underlying the misdemeanor DUI conviction. The court told the jury that in a conversation with the prosecutor about Hynes's criminal record, the officer "represented that he had a wet reckless, alcohol-related reckless driving, which is a lesser offense of driving under the influence of alcohol, in 1995. But it's been ascertained that he actually had a driving under the influence of alcohol in 1999. So it's something that you should be aware of, and I'm not going to categorize it as being truthful or untruthful, but that was what was told to the District Attorney, and then the facts were different from what he was told . . ." Although the court did not expressly characterize Hynes's representation to the

20

prosecutor as untruthful, it would have been difficult for the jury to draw any other conclusion from this instruction, especially as the jury's deliberations were interrupted to provide it, suggesting the information was of particular significance. Had the court ordered the prosecutor to run the rap sheet, the jury would not have received this information from the court.

It is worth reiterating that we do not in any way countenance the prosecutor's refusal to take a most basic step to ensure provision of accurate discovery to the defense. But the belatedly disclosed information here cannot reasonably be seen as putting the case in "such a different light as to undermine confidence in the verdict." (*Kyles v. Whitney, supra,* 514 U.S. at p. 435, fn. omitted.) We are convinced that the jury's verdict would have been no different if the trial court had ordered the prosecutor to run the rap sheet or, for that matter, if the prosecutor had voluntarily done so.

Our conclusion that there was no *Brady* violation inevitably leads us to reject appellant's characterization of the issue as structural error. Most errors implicating a federal constitutional right "are amenable to harmless error analysis." (*People v. Aranda* (2012) 55 Cal.4th 342, 363; *Arizona v. Fulminante* (1991) 499 U.S. 279, 307–308.) "[O]nly a 'very limited class of cases' are subject to per se reversal." (*People v. Aranda, supra,* 55 Cal.4th at p. 363, quoting *Johnson v. United States* (1997) 520 U.S. 461, 468.) Most errors "are ' "trial error[s]," ' occurring 'during the presentation of the case to the jury.' ([*Arizona v. Fulminante, supra,* 499 U.S.] at p. 307.) They are amenable to harmless error review because they can be 'quantitatively assessed in the context of other evidence presented in order to determine whether [their] admission was harmless beyond a reasonable doubt.' (*Id.* at p. 308.) 'Structural defects,' on the other hand, 'defy analysis by "harmless-error" standards' (*id.* at p. 309) because they are not 'simply an error in the trial process,' but rather an error 'affecting the framework within which the trial proceeds' (*id.* at p. 310; see *Brecht v. Abrahamson* (1993) 507 U.S. 619, 630 [123 L.Ed.2d 353, 113 S.Ct. 1710] [structural errors require automatic reversal because 'they infect the entire trial process'])." (*People v. Aranda, supra,* 54 Cal.4th at pp. 363–

21

364, quoting *Arizona v. Fulminante, supra,* 499 U.S. 279.)

Here, even if the claimed error had resulted in material evidence regarding Hynes's credibility being withheld from the defense, this would have affected the information presented to the jury, an error amenable to assessment in light of the other evidence presented. It would not have affected the entire framework within which the trial took place in the manner of errors that have been viewed as structural, such as "denial of counsel or of self-representation, racial discrimination in jury selection, and trial before a biased judge." (*People v. Aranda, supra,* 54 Cal.4th at p. 364; *Arizona v. Fulminante, supra,* 499 U.S. at pp. 309–310.) Since any error committed here did *not* result in the withholding of material evidence, there is even less basis for appellant's characterization.

## II.

Appellant next contends that his convictions must be reversed because he was prejudiced by the prosecution's late production of discovery. In particular, appellant's claim is based on the late disclosure of the bus surveillance video and medical records regarding Hynes's injury, which were provided to the defense on the second and third day of trial, as well as the information about Hynes's conviction discussed above. In the trial court, appellant unsuccessfully moved for a mistrial due to the late disclosure of the video, medical records and information concerning Damian's 2004 arrest; here, he argues the denial of the mistrial motion was reversible error. Appellant maintains that the late discovery affected almost every prosecution witness and item of evidence and prevented him from being able to use the discovery in preparing his defense, that the prosecutor's "unclean hands" exacerbated the resulting violation of his constitutional rights to due process and a fair trial, and that the trial court's remedial jury instruction was insufficient to cure the error.

Discovery in criminal cases is governed by section 1054 et seq. (§§ 1054, subd. (e), 1054.5.) Absent good cause for denial, restriction or deferral, the required disclosures must be made at least 30 days prior to trial and information that becomes

22

known to or comes into the possession of a party within 30 days of trial must be disclosed immediately. (§ 1054.7.) The purposes of the discovery provisions are to "promote the ascertainment of truth in trials by requiring timely pretrial discovery[,]" "save court time by requiring that discovery be conducted informally between and among the parties before judicial enforcement is requested[,]" "save court time in trial and avoid the necessity for frequent interruptions and postponements[,]" "protect victims and witnesses from danger, harassment, and undue delay of the proceedings[,]" and "provide that no discovery shall occur in criminal cases except as provided by this chapter, other express statutory provisions, or as mandated by the Constitution of the United States." (§ 1054.)

The bus surveillance video was provided to the defense on July 20, the second day of trial, after defense counsel told the court that the prosecutor had first told him that morning that he had obtained the surveillance video from the bus, which the defense had requested in discovery in March. Defense counsel argued that the late discovery interfered with his ability to respond to the evidence, raising statutory and constitutional objections.

The following morning, after reviewing the video with appellant, defense counsel asked that it be excluded as a remedy for the late discovery, arguing that the video was confusing, appearing to have been taken from different angles with portions and unclear time sequences, and that he had not been able to consult with a technical person or expert. The prosecutor, who had taken over the case less than a week before, explained that he had only learned there was a video the day before. The file reflected that an initial request for the surveillance video had been made when charges were filed but nothing had been obtained; the day before, when the prosecutor saw the transit manager in court, he asked if there was surveillance available and was able to obtain it. The prosecutor did not know who had edited the tape. Defense counsel protested that the prosecutor's office had known of the existence of the surveillance tape because the detective's report indicated he had contacted the transit agency on March 4 and was told the video would be available at 2:00 p.m. The court said it looked like the video had "slipped through the

23

tracks" and asked if the defense had tried again to obtain it after the March discovery request; defense counsel asserted he did not file a motion to compel as it was the People's self-executing duty to disclose it and the defense had already requested it.

The prosecutor sought admission of the video on the theory that although it did not show the actual incident, it substantiated the lawfulness of the officer's conduct by demonstrating appellant's belligerent conduct on the bus that "transferred completely into the contact where Officer Hynes was making contact to investigate this incident." After watching the video, when the court asked defense counsel to articulate how it would prejudice the defense, counsel stated that the primary basis for his objection was his inability to "make sense" of the video when he first watched it, but that the after hearing the prosecutor's explanations of how the various tracks fit together while the tape was played in court, he was less confused. To the extent the defense was prejudiced, counsel stated, it was because he still did not understand how the video was put together, what footage was or was not included, and what each of the separate views on the screen showed. The court ruled that the video would be admitted but would be one of the items mentioned in a jury instruction stating that the prosecution had disclosed certain evidence in an untimely manner. Defense counsel proposed an instruction he had drafted for this purpose in lieu of the standard CALCRIM No. 306.[10]

---

[10] The proposed instruction was as follows:

"The prosecution and the defense are required to disclose to each other before trial the evidence each intends to present at trial so as to promote the ascertainment of the truth, save court time, and avoid any surprise that may arise during the course of the trial. Concealment of evidence or delay in the disclosure of evidence may deny a party a sufficient opportunity to investigate the facts of the case, subpoena necessary witnesses, or produce evidence that may exist to rebut the non-complying party's evidence.

"Disclosures of evidence are required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately. In this case, the prosecution concealed and failed to timely disclose (1) video surveillance from the Tri-Delta Transit bus (2) and the fact that Terry Damien previously resisted arrest in violation of Penal Code section 69.

24

The medical records were also provided to the defense on July 20. The prosecutor had explained the day before that he had received the medical records that morning but not the declaration of the custodian of records that would permit admission of the records without the custodian's testimony, and that the declaration had since been obtained. After the records were provided, defense counsel objected to their admission as hearsay and as having been untimely disclosed under section 1054. The trial court overruled the objection, finding that the custodian's declaration sufficiently satisfied Evidence Code section 1271 and that the prosecution provided the records to the defense as soon as it received them, but stated it would consider giving a jury instruction as a sanction for late discovery.[11]

Presentation of the case to the jury began on the afternoon of July 21, the third day of trial. On July 22, appellant moved for a mistrial based on the late discovery of the surveillance video, the medical records and late-disclosed evidence that Damian had been arrested in 2004 for resisting arrest.[12] The court denied the motion, explaining that it

_____

"The prosecution's concealment and failure to timely disclose evidence were without lawful justification.

"If you find that the concealment and delayed disclosure by the prosecution relate to a fact of importance rather than something trivial, and do not relate to subject matter already established by other credible evidence, you may consider that concealment and delayed disclosure in determining the believability or weight to be given to that particular evidence, and you may conclude the prosecution delayed disclosure to gain an unfair strategic or tactical advantage."

[11] Also on July 20, the prosecutor informed the court he had just obtained a recording of a call to 911, which was being transcribed. Defense counsel objected to admission of the call on the grounds that the late disclosure was untimely under the discovery statute (§ 1054) and violated appellant's constitutional rights to a fair trial and effective assistance of counsel, as well as that the call was hearsay. The court indicated the evidence would likely not be admissible and ordered it turned over to the defense. The 911 call did not factor into appellant's motion for a new trial.

[12] The defense first learned of Damian's 2004 arrest when the prosecutor mentioned it during discussion on motions in limine on the first day of trial, July 19. The court ordered the prosecutor to disclose the police report to enable the defense to determine whether there were circumstances reflecting moral turpitude such that the court

25

intended to give a jury instruction advising of the untimely disclosure under the discovery statute but did not think the defense had been significantly prejudiced.

The medical records were next discussed on July 23, when appellant objected that statements by Hynes to medical staff related in the records were hearsay, that statements of diagnosis or findings were inadmissible without information as to the qualifications of the person who rendered the opinion, and that medical jargon (such as "lateral epicondylitis and closed FX of hand") should not be admitted without an expert to explain it to the jury. After argument, the court found the records admissible.

Defense counsel asked the court to instruct the jury regarding the late discovery with the instruction he had prepared, because he felt CALCRIM No. 306 did not tell the jury why late disclosure might be significant or that the prosecution's failure to timely disclose was without legal justification.[13] The court concluded that it would give CALCRIM No. 306, finding that appellant's proposed instruction contained "some argumentative points," but, over the prosecution's objection that the instruction should only apply to the surveillance video, that the instruction would address the video, the medical records and Damian's arrest. At this point the prosecutor asked that the instruction not mention the medical records, urging, "I don't even know if there's a basis that we intended to use it. We didn't use it at the prelim." The court found this argument

_____

might permit impeachment. The defense was given the police report the following afternoon and, after argument, the court ruled Damian could be impeached with the conduct it described. On this appeal, appellant does not argue he was prejudiced by the late disclosure of this information.

[13] The court noted that the only evidence the defense did not know the existence of was Damian's arrest, and defense counsel responded that knowing of the existence of the surveillance video and medical records without seeing them did not permit him to prepare for trial. The court questioned why defense counsel had not followed up on his initial discovery request, defense counsel took issue with the court "shifting the burden" and suggesting he had to file a motion to compel when the prosecutor was required to provide the evidence even without a request, and the court acknowledged that it was not the defense's burden.

26

"rings hollow" as "any reasonable DA" would present medical records to prove serious bodily injury.

Appellant argues here that he was prejudiced by the late disclosure of the video, the medical records, and Hynes's conviction, and that the jury instructions given by the court were insufficient to avoid this prejudice. We have already discussed, and rejected, appellant's claim with respect to Hynes's conviction. Regarding the surveillance video, appellant argues he was prejudiced because defense counsel had no time to carefully analyze the video to see if some frames showed appellant behaving in a manner different from what Hynes described or otherwise contradicted prosecution witnesses. He argues he was prejudiced by not receiving the medical records until after the jury had been selected, the day before presentation of the evidence began, because defense counsel did not have sufficient time to consult with expert witnesses and incorporate their responses into the defense case.

A motion for mistrial "should be granted only when ' "a party's chances of receiving a fair trial have been irreparably damaged." ' " (*People v. Ayala* (2000) 23 Cal.4th 225, 282, quoting *People v. Welch* (1999) 20 Cal.4th 701, 749.) The trial court's ruling is reviewed for abuse of discretion. (*People v. Ayala, supra,* at p. 282.) Here, the trial court denied the mistrial motion because it did not believe the defense was significantly prejudiced by the late discovery.

We find no abuse of discretion. The trial court found that the medical records were provided as soon as the prosecution obtained them. The injury Hynes suffered was not complex; there was no dispute his finger was fractured. The issue at trial was not what kind of injury he suffered, but whether that injury amounted to "serious bodily injury" and whether appellant's resisting arrest was the cause of the injury. The medical records did not bear on the circumstances in which the injury occurred. While they substantiated that Hynes's finger was fractured, they were not critical to the determination whether this was a "serious bodily injury." The jury was instructed that "serious bodily injury means a serious impairment of physical condition. Such an injury

27

may include, but is not limited to, loss of consciousness, concussion, bone fracture, protracted loss or impairment of function of any bodily member or organ, a wound requiring extensive suturing, and serious disfigurement." (CALCRIM No. 2655; §§ 148.10, 243, subd. (f)(4).) According to this definition, a bone fracture may or may not constitute serious bodily injury, depending upon whether it results in a " 'serious impairment of physical condition.' " (*People v. Taylor* (2004) 118 Cal.App.4th 11, 25, fn. 4; *People v. Nava* (1989) 207 Cal.App.3d 1490, 1497–1498.) The evidence of "serious bodily injury," therefore, was less the fact of the fracture, which was not contested, than Hynes's testimony that he was in a cast for six weeks and restricted to desk duty because of his injury. Earlier access to the medical records would not have altered the outcome.

As for the surveillance video, appellant's prejudice argument is based on nothing but speculation that, if he had had more time, defense counsel might have found something in the video to contradict the prosecution witnesses. The video does not show any part of the actual encounter between appellant and Hynes. What it shows of appellant's behavior before that encounter, if anything, likely would have helped appellant in that it does not show any aggressive conduct. Indeed, defense counsel argued this point to the jury, noting that the video never showed appellant disturbing the peace or harassing anyone. And, as defense counsel also told the jury, the video was favorable to appellant's case in that it includes audio of appellant yelling "stop hurting me" and does *not* reflect Hynes yelling as he approached appellant, as the officer testified he did. As with the medical records, earlier access to the video would not have altered the outcome of the trial.

Moreover, the defense received the benefit of the instruction alerting the jury to the fact that these evidentiary items had not been timely disclosed. Appellant argues the instruction was insufficient because it did not direct the jurors how to evaluate the effects of the late provision of discovery. He likens the instruction given here to that criticized

28

in *People v. Bell* (2004) 118 Cal.App.4th 249, 257.[14]  The instruction given in *Bell*, a case

in which it was the defense that did not provide timely discovery, was an earlier standard

instruction since replaced by the one given in the present case, CALCRIM No. 306.  Part

of the problem in *Bell*, which does not exist in our case, was that the instruction referred

to "the defendant" when it was not the defendant himself but defense counsel who was

responsible.  (*Id.* at pp. 254–255.)  Additionally, the instruction in *Bell* told the jury that

the "weight and significance of any delayed disclosure" were matters for its

consideration, and that it "should consider whether the untimely disclosed evidence

pertain[ed] to a fact of importance, something trivial or subject matters already

established by other credible evidence," but gave the jury no guidance on *how* to evaluate

the weight and significance of the discovery violation.  (*Ibid.*)  CALCRIM No. 306

directed the jury that in evaluating the weight and significance of the evidence, it should

consider the "effect" of the late disclosure, after defining what that effect could be by

---

[14] The instruction in *Bell* was CALJIC No. 2.28:  "The prosecution and the defense are required to disclose to each other before trial the evidence each intends to present at trial so as to promote the ascertainment of truth, save court time and avoid any surprise which may arise during the course of the trial.  Delay in the disclosure of evidence may deny a party a sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the non-complying party's evidence.  [¶] Disclosures of evidence are required to be made at least 30 days in advance of trial.  Any new evidence discovered within 30 days of trial must be disclosed immediately. In this case, the Defendant failed to timely disclose the following evidence:  [¶] 1. The statement of witness Bobby Jones.  [¶] 2. The statement of witness Patrice Lucious.  [¶] 3. The statement of witness Teresa Williams.  [¶] Although the Defendant's failure to timely disclose evidence was without lawful justification, the Court has, under the law, permitted the production of this evidence during the trial.  [¶] The weight and significance of any delayed disclosure are matters for your consideration.  However, you should consider whether the untimely disclosed evidence pertains to a fact of importance, something trivial or subject matters already established by other credible evidence." (*People v. Bell, supra,* 118 Cal.App.4th at p. 254.)

29

stating that late disclosure might "deny the other side the chance to produce all relevant evidence, to counter opposing evidence, or to receive a fair trial."[15]

The trial court did not err in refusing to replace CALCRIM No. 306 with appellant's proposed instruction. The proposed instruction was very similar to the one criticized in *Bell*, except that it directed the jury that if it found the "concealment and delayed disclosure" related to a fact of importance not otherwise established by other credible evidence, "you may consider that concealment and delayed disclosure in determining the believability or weight to be given to that particular evidence and you may conclude the prosecution delayed disclosure to gain an unfair strategic or tactical advantage." The last point was clearly argumentative, as the trial court indicated.

### III.

Appellant next contends his convictions must be reversed due to prosecutorial misconduct. He claims misconduct in the prosecutor's failure and refusal to provide discovery of Hynes's rap sheet or an accurate criminal history for the officer, either upon request of the defense or court order; the prosecutor's alleged dishonesty in responses following his initial disobedience of the order to run the rap sheet; and the prosecutor's untimely provision of Hynes's medical records.

This argument is essentially a recast version of those we have already discussed: Events at trial that formed the factual backdrop of the claims discussed above—the prosecutor's statement that he believed the court had given him the option of running the rap sheet rather than ordering him to do so, explanations of how incorrect information came to be given to the defense and court, and attempt to avoid having the jury learn of

---

[15] As given in the present case, CALCRIM No. 306 states: "Both the People and the defense must disclose their evidence to the other side before trial, within the time limits set by law. Failure to follow this rule may deny the other side the chance to produce all relevant—all relevant evidence, to counter opposing evidence, or to receive a fair trial. [¶] An attorney for the People failed to disclose the bus videotape and medical records of Officer Hynes. In evaluating the weight and significance of that evidence, you may consider the effect, if any, of that late disclosure."

30

the late disclosure of the medical records, along with the trial court's questioning of these actions—are now raised as examples of prosecutorial misconduct.

We need not determine whether the prosecutor committed misconduct. Appellant recognizes that, if there was misconduct, "[t]he ultimate question to be decided is, had the prosecutor refrained from the misconduct, is it reasonably probable that a result more favorable to the defendant would have occurred." (*People v. Strickland* (1974) 11 Cal.3d 946, 955.) Here, all the claimed misconduct was in attempting to keep evidence from the defense that might have been helpful to appellant's case. As we have discussed, the late disclosure would not have altered the outcome of the trial. Any misconduct that occurred was not prejudicial.

## IV.

Appellant additionally urges reversal of count two is required because the trial court failed to deliver a unanimity instruction and the prosecutor argued that five different acts could form the basis for this count.

"In a criminal case, a jury verdict must be unanimous. (*People v. Collins* (1976) 17 Cal.3d 687, 693; see Cal. Const., art. I, § 16 [expressly stating that 'in a civil cause three-fourths of the jury may render a verdict' and thereby implying that in a criminal cause, only a unanimous jury may render a verdict].) . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. (*People v. Diedrich* (1982) 31 Cal.3d 263, 281.) Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. (*People v. Castro* (1901) 133 Cal.11, 13; *People v. Williams* (1901) 133 Cal. 165, 168 ; CALJIC No. 17.01; but see *People v. Jones* (1990) 51 Cal.3d 294.)

"This requirement of unanimity as to the criminal act 'is intended to eliminate the danger that the defendant will be convicted even though there is no single offense which all the jurors agree the defendant committed.' (*People v. Sutherland* (1993) 17 Cal.App.4th 602, 612.) . . . 'The [unanimity] instruction is designed in part to prevent

the jury from amalgamating evidence of multiple offenses, no one of which has been proved beyond a reasonable doubt, in order to conclude beyond a reasonable doubt that a defendant must have done *something* sufficient to convict on one count.' (*People v. Deletto* (1983) 147 Cal. App.3d 458, 472.)

"On the other hand, where the evidence shows only a single discrete crime but leaves room for disagreement as to exactly how that crime was committed or what the defendant's precise role was, the jury need not unanimously agree on the basis or, as the cases often put it, the 'theory' whereby the defendant is guilty. (See generally *People v. Jenkins* (2000) 22 Cal.4th 900, 1024-1026.)." (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) " '[T]he unanimity instruction is not required when the acts are so closely connected in time as to form part of one transaction. [Citations.] This branch of the "continuous conduct" exception [citation] applies if the defendant tenders the same defense or defenses to each act and if there is no reasonable basis for the jury to distinguish between them. [Citations.]' (*People v. Crandell* (1988) 46 Cal.3d 833, 875; see also *People v. Maury* (2003) 30 Cal.4th 342, 423.)" (*People v. Bui* (2011) 192 Cal.App.4th 1002, 1010–1011.)

For example, in *People v. Lopez* (2005) 129 Cal.App.4th 1508, the defendant was convicted of resisting a peace officer after he failed to comply with an officer's order to turn and put his hands behind his back, then struggled as various combinations of officers grabbed his arms, took him to the ground, subdued him enough to handcuff him and dragged him to the patrol car. On appeal, the defendant argued the trial court erred in failing to give a unanimity instruction because some jurors could have based their conclusions on his conduct toward one officer and others based their conclusions on his conduct toward a different officer. *Lopez* found no error, citing the rules that no unanimity instruction is required when multiple offenses are so closely connected in time as to be part of a single transaction and when a prosecutor elects to rely upon multiple acts in a continuous course of conduct as a single crime, and finding no evidentiary basis

32

for the jury to conclude the defendant resisted one of the officers but not another. (129 Cal.App.4th at pp. 1533–1534.)

Here, appellant was charged in count two with resisting an executive officer (§ 69).[16] "Section 69 'sets forth two separate ways in which an offense can be committed. The first is attempting by threats or violence to deter or prevent an officer from performing a duty imposed by law; the second is resisting by force or violence an officer in the performance of his or her duty.' ([*In re*] *Manuel G.* [(1997)] 16 Cal.4th [805,] 814; see generally 2 Witkin & Epstein, Cal. Criminal Law [(3d. ed. 2000)] Crimes Against Governmental Authority, § 119, pp. 1212–1213.) The two ways of violating section 69 have been called 'attempting to deter' and 'actually resisting an officer.' (*People v. Lopez* [, *supra,*] 129 Cal.App.4th 1508, 1530 . . . .)" (*People v. Lacefield* (2007) 157 Cal.App.4th 249, 255.)

The prosecutor here told the jury that the "strongest" basis for count two was the theory of resisting arrest by force but that the evidence also supported finding that appellant attempted to deter the officer by use of threats.[17] Appellant contends the

---

[16] Section 69 sets forth the punishment for "[e]very person who attempts, by means of any threat or violence, to deter or prevent an executive officer from performing any duty imposed upon such officer by law, or who knowingly resists, by the use of force or violence, such officer, in the performance of his duty, . . . ."

[17] In argument, the prosecutor told the jury that there are "two parts to Count Two. There's two theories in which it can be proved based on threats, statements and conduct that's threatening to the officer to hopefully deter him from performing his duties. That, I submit, is not the strongest count. [¶] The more substantive count is out of Count Two, based on the theory, is resisting the officer by force using force to resist the officer from doing his job. That count, I submit, has been proved beyond a reasonable doubt, as well as the resisting arrest, which in the process caused serious bodily injury to the officer." After discussing the evidence underlying count one, the infliction of serious bodily injury while resisting a peace officer, and the forceful resistance theory of count two, the prosecutor told the jury count two also could be established by proof that appellant "willfully and unlawfully used violence or a threat of violence to try to prevent or deter an executive officer from performing the officer's lawful duty. So it's dealing with threats or conduct that is threatening." The prosecutor stated, "There's a good chance he

prosecutor offered the jury at least five discreet acts, three of force or violence and two threats, as possible bases of count two, and neither he nor the court informed the jurors that all 12 had to agree on the act or acts constituting the offense. The transcript reflects that the prosecutor told the jury that the evidence showed appellant used force or violence to resist an executive officer when he "came after the officer," which constituted "an assault," and "had to be taken to the ground," and when he "beg[an] flailing," "bucking to the extend he flips over" and then "trie[d] to grab the holster and does, in fact, grab the holster." As an expressly secondary argument, the prosecutor then told the jury that count two could be established by proof that appellant "willfully and unlawfully used violence or a threat of violence to try to prevent or deter an executive officer from performing the officer's lawful duty. So it's dealing with threats or conduct that is threatening." The prosecutor asked the jury to look at appellant's behavior—saying "[j]ust kill me" when he was on the ground, then telling Hynes, "[y]our shoelace is untied" and grabbing for Hynes's gun—and told the jury, "[a] threat may be implied by a pattern of conduct or a combination of statements and conduct. So, in other words, if your behavior and your statements, when looked at in their totality and context, are threatening, and it's done for the purpose of dissuading an officer, that also can be a crime."

This case falls within the exception described above: The acts described by the prosecutor were " 'so closely connected in time as to form part of one transaction,' " appellant " 'tender[ed] the same defense or defenses to each act' " and " 'there [was] no reasonable basis for the jury to distinguish between them. [Citations.]' " (*People v. Bui, supra,* 192 Cal.App.4th at pp. 1010–1011.) Some of the specifics of appellant's defense differed for different acts—he acknowledged moving toward the Hynes and referring to Hynes's shoelace but characterized these actions differently than Hynes's did, but he denied ever reaching for Hynes's holster—but his fundamental defense was the same for

did this, too. But I'll submit the case is not nearly as strong as the other two counts, resisting, which caused serious bodily injury, and resisting by using force or violence."

all:  In an altered state of mind from his ingestion of crack, he viewed the officer as a friend there to help him and never resisted the officer's performance of his duties.  The jury had to decide between appellant's version of the events and Hynes's; there was no reasonable basis for concluding that some of the acts Hynes described occurred and others did not.

Moreover, even if the unanimity instruction should have been given, there was no prejudice.  "The failure to give a unanimity instruction may be harmless error if we can conclude beyond a reasonable doubt that all jurors must have unanimously agreed on the act(s) constituting the offense.  (*People v. Deletto, supra*, 147 Cal. App.3d at p. 472; accord, *People v. Wolfe* (2003) 114 Cal.App.4th 177, 186–188.)"  (*People v. Norman* (2007) 157 Cal.App.4th 460, 466; *People v. Ramirez* (1987) 189 Cal.App.3d 603, 615, disapproved on other grounds in *People v. Russo, supra,* 25 Cal.4th at pp. 1136–1137.)[18] As just stated, there was no basis for a reasonable juror to believe that some but not all of the acts described by Hynes occurred.[19]

## V.

Appellant's final contention is that he was entitled to twice the number of presentence custody conduct credits he was actually awarded.  He maintains that the

---

[18] There remains a split in authority as to the correct standard of review for error in failing to give a unanimity instruction.  (*People v. Milosavljevic* (2010) 183 Cal.App.4th 640, 647; *People v. Smith* (2005) 132 Cal.App.4th 1537, 1545; *People v. Wolfe, supra,* 114 Cal.App.4th 177, 185–188; *People v. Ramirez, supra,* 189 Cal.App.3d at p. 615.)  We adhere to our view that the proper standard is harmless beyond a reasonable doubt, the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24.  (*People v. Ramirez, supra,* 189 Cal.App.3d at p. 615, fn. 13.)

[19] Appellant urges that even if individual errors at trial were not prejudicial, the cumulative effect of the errors requires reversal.  We are not persuaded.  With the exception of the failure to give a unanimity instruction, as to which we have found no error, appellant's claims relate to the prosecutor's conduct in failing to provide timely discovery.  We have concluded that earlier disclosure of each item of evidence at issue would not have altered the outcome of the trial.  This conclusion is the same when the evidence is considered collectively.

court awarded his credits under an incorrect version of the governing statute because the court clerk was unaware of an amendment increasing the number of conduct credits available. Recognizing that the court also expressed concern about problems during custody noted in the probation report, appellant argues the court could not properly reduce his presumptive credits without notice and a hearing.

Section 4019 provides prisoners in local custody "the opportunity to earn 'conduct credit' against their sentences for good behavior. Conduct credits encourage prisoners to conform to prison regulations, to refrain from criminal and assaultive conduct, and to participate in work and other rehabilitative activities." (*People v. Brown* (2012) 54 Cal.4th 314, 317.) Currently, and prior to January 25, 2010, section 4019 allows such prisoners to earn two days of conduct credit for every four days of actual custody. (§ 4019, subd. (b), (c), (f).) For an eight-month period in 2010, from January 25, 2010, until September 28, 2010, a since-superseded version of section 4019, allowed defendants with no current or prior convictions for serious or violent felonies, and who are not required to register as sex offenders, to earn two days of conduct credit for every *two* days of actual custody. (*People v. Brown, supra,* 54 Cal.4th at pp. 317–318; Stats. 2009, 3d Ex. Sess., 2009–2010, ch. 28, § 50, subsequently amended by Stats. 2010, ch. 426, § 2, Stats. 2011, ch. 15, § 482, Stats. 2011, ch. 39, § 53, and Stats. 2011, 1st Ex. Sess., 2011–2012, ch. 12, § 35.) Appellant was arrested on March 2, 2010, during this window of increased custody credit availability.

At sentencing, defense counsel told the court appellant was entitled to day-for-day credit under the amended section 4019. Appellant had 284 days of actual custody credit. When the clerk stated appellant had 142 days of credit, defense counsel urged the correct number was 284, because appellant committed his offense during the window of increased credit under section 4019. The court stated, "there are some other issues with regard to the defendant's conduct credits because there have been problems, as noted, in the probation report while he's been in custody, so I don't know how that's been dealt with at the jail." At this point, defense counsel urged that if credits were going to be

36

denied, appellant would be entitled to a hearing at which the court could make factual findings about his conduct, noting that the conduct described in the probation report was hearsay. When counsel asked how the clerk arrived at the number of credits, the clerk said "50 percent" and counsel pointed out that 50 percent was under the "old" section 4019 rules. The clerk responded, "That may be and I don't have the amendment." Defense counsel stated, "Assuming he is entitled to them and his behavior has not disqualified him, I maintain it's day-for-day." The court concluded, "I understand your argument. The minute order will reflect and the abstract will reflect 284 actual days, and then if there's a problem later, then bring it to my attention." The minute order for the sentencing hearing notes "284 actual days credit" and the abstract of judgment reflects total credits of 426, 284 actual and 142 local credit.

The record supports appellant's contention that the clerk incorrectly advised the court as to the number of days to which appellant was presumptively entitled under the version of section 4019 in effect at the time his offenses were committed, and respondent concedes the applicable scheme called for day-to-day conduct credits. Respondent contends, however, that the 142 credits appellant did not receive were properly denied on the basis of the behavior problems in jail reflected in the probation report.

The probation report stated that "numerous incidents" were noted in jail management records for appellant's incarceration from March 2, 2010, to the date of the report, August 11, 2010. The report described 13 separate occasions on which appellant was involved in violent incidents with other inmates and/or deputies or otherwise created disturbances, sometimes requiring deputies to use Tasers to subdue him and sometimes resulting in him being placed in restraints.[20] Some of the incidents resulted in mental

---

[20] According to the report, on March 6, 2010, appellant was detained after being observed taking another inmate to the ground and putting him in a headlock; appellant became "extremely agitated," including throwing a table, smashing a phone against the wall, kicking a chair and resisting deputies, and, after a disciplinary hearing, was placed on 10 days lockdown with an additional 11 days loss of privileges.

A March 10 incident which involved appellant threatening a deputy with his fist and resisting efforts to handcuff him did not result in a disciplinary hearing. On April 9, 2010, appellant created a disturbance and explained that he acted out in order to be moved to a different module because he "feared for his safety, and need[ed] to see mental health." He was approved for transfer and not disciplined. The next day, appellant was the victim of an assault by another inmate; he was not disciplined because he was the victim. On May 17, appellant was found bleeding after another inmate was seen running out of his room; he was not disciplined but was reclassified. On each of June 2 and June 20, appellant had a verbal dispute with an inmate who complained he was tired of appellant threatening or harassing him; no discipline resulted. On June 22, appellant's cellmate reported appellant threatened to stab him with a pencil; appellant complained the cellmate urinated on the floor and hit him on the head.

On June 23, appellant told a deputy there was going to be bloodshed at free time: Other inmates were threatening him because he had caused a module worker to clean up a mess he made and appellant threatened he would " 'bang their heads against a pillar and split it open if he had to' " and said he was " 'sick of the shit, and that he will do whatever is necessary to make sure everything stops and if there needs to be blood shed [*sic*], then there's going to be bloodshed." Appellant was reclassified, placed in another cell and referred to mental health, with no disciplinary action. On July 15, appellant kicked his door for several hours, repeatedly threatened to hurt himself and apparently scratched his wrist with the broken plastic cover of his deodorant. He was evaluated by mental health, placed in a safety cell and later returned to his module.

On July 29, appellant banged on his cell door and refused to stop until he was released, refused to be handcuffed and assumed a fighting stance toward deputies. After several unsuccessful deployments of a Taser, appellant submitted to being handcuffed; he was placed into a safety cell with ankle restraints, then later returned to his module. Following a disciplinary hearing, he was locked down from July 30 to August 9 and lost privileges until August 20.

On July 30, appellant repeatedly hit his door with enough force to hurt himself. He was placed in a safety cell and ankle restraints. The next day appellant was moved to a "sobering cell" without incident, but when returned to his module began forcefully kicking his cell door. Asked why he was doing this, appellant dropped to the floor crying, then began banging again, broke out the cell door window and started flooding the cell. A Taser had little effect, appellant blocked the door with his mattress and appeared to reach for an object to "possibly" use as a weapon. Appellant was eventually tased and placed in a safety cell in ankle restraints, then charged deputies who tried to push him back into the cell when he tried to crawl out. Deputies struck appellant as he continued to grab them, and he was tased, secured in ankle restraints, secured to the floor, then later sent to the Contra Costa County Regional Medical Center because he was unable to calm down and had been restrained for a long time.

38

health evaluations and one in appellant being taken to a hospital. Two of the incidents resulted in disciplinary hearings and appellant being placed on lockdown and losing privileges; the others sometimes resulted in changes of classification or housing but not in discipline.

A prisoner is entitled to good time credit "unless it appears by the record that the prisoner has not satisfactorily complied with the reasonable rules and regulations" of the institution and to work time credit "unless it appears by the record that the prisoner has refused to satisfactorily perform labor as assigned." (§ 4019, subds. (b)–(d).) A court "must afford a defendant due process—notice and a fair hearing—in determining the amount of conduct credit to which he or she is entitled. (*People v. Duesler* (1988) 203 Cal.App.3d 273, 276–277.)" (*People v. Lara* (2012) 54 Cal.4th 896, 901.) "[B]efore a sentencing court may withhold conduct credits, the defendant is entitled to prior notice and an opportunity to (1) rebut the findings of his jail violations, and (2) present any mitigating factors. (*In re Walrath* [(1980)] 106 Cal.App.3d [426,] 433.)" (*People v. Duesler, supra,* 203 Cal.App.3d at p. 277.)

Respondent urges that the probation report's lengthy discussion of appellant's often serious misconduct in jail put him on notice that he did not engage in "good conduct" and, therefore, his conduct credits were in jeopardy. "The presentence report is an appropriate vehicle for alerting the defendant that his conduct credits are in jeopardy where it suggests or recommends such action." (*People v. Duesler, supra,* 203 Cal.App.3d at p. 277.) Here, as respondent acknowledges, the report made no recommendation regarding conduct credits. Moreover, respondent ignores the fact that due process requires both notice *and* a hearing. As indicated above, the court's remarks at sentencing suggest that its view on the question of custody credits might depend on how appellant's conduct was dealt with by the jail, and the probation report makes clear that much of the conduct described was dealt with as a matter of mental health rather than a subject of discipline. Additionally, the probation report contains no information that would bear on appellant's entitlement to work-time, as opposed to good-time, credit.

39

(See *People v. Johnson* (1981) 120 Cal.App.3d 808 [work-time credits a separate consideration from good-time credits].)  The trial court erred in failing to hold a hearing to investigate the factual basis for denying appellant some of the conduct credits to which he was otherwise entitled.  Remand is required.  (*People v. Duesler, supra,* 203 Cal.App.3d at p. 278; *People v. Johnson, supra,* 120 Cal.App.3d at p. 816.)

## DISPOSITION

The judgment is reversed insofar as it fixes conduct credits and the matter is remanded for reconsideration of conduct credits after a hearing held in accordance with the views expressed herein.  In all other respects, the judgment is affirmed.


_____
Kline, P.J.


We concur:


_____
Haerle, J.


_____
Richman, J.